UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PHILLIP FRIESON,                                    :

             Petitioner,                    :          11 Civ. 0168 (PKC) (AJP)

    -against-                                  :          **REPORT AND RECOMMENDATION**

DANIEL MARTUSCELLO,                            :

            Respondent.                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable P. Kevin Castel, United States District Judge:**

        Pro se petitioner Phillip Frieson seeks a writ of habeas corpus from his May 25, 2005

conviction in Supreme Court, Bronx County, of first degree robbery and sentence of thirteen years

imprisonment.  (Dkt. No. 1: Pet. ¶¶ 1-5; Dkt. No. 19: Frieson Traverse at 1.)

        Frieson's habeas petition asserts that:  (1) the prosecutor withheld <u>Brady</u> evidence and

discovery material at the suppression hearing and trial (Dkt. No. 1: Frieson Pet. Att. at 1-2; Frieson

Traverse at 1-6); (2) Frieson's trial counsel was ineffective for failing to (a) obtain the identity of

the driver of the cab Frieson was riding in when he was arrested (Frieson Pet. Att. at 2, 8-9; Frieson

Traverse at 11-15, 23-25); (b) investigate and call the cab driver as a witness during the suppression

hearing and trial (Frieson Pet. Att. at 4-5, 8-9, 13-15; Frieson Traverse at 6-15, 23-25); and (c) call

Frieson's mother as an alibi witness at trial (Frieson  Br. at 8, 9-12, 16-18; Frieson Traverse at 11,

15-23, 25, 26-27).

        For the reasons set forth below, Frieson's habeas corpus petition should be DENIED.

## FACTS

In September 2002, the New York City Police Department was investigating a pattern of yellow cab robberies in the Bronx.  (Dkt. No. 18: Killian Aff. Ex. 1: Frieson 1st Dep't Br. at 3, 6; Killian Aff. Ex. 2: State 1st Dep't Br. at 4-5.)   On September 30, 2002, Detective Arthur Schroeder observed Frieson sitting in the back of a yellow cab, leaning through the partition and arguing with the driver as the cab drove over the Willis Avenue Bridge into the Bronx.  (Frieson 1st Dep't Br. at 8-9; State 1st Dep't Br. at 5-6.)  Det. Schroeder stopped the cab because Frieson fit the description of the robbery suspect and recovered an imitation pistol on the floor where Frieson was sitting.  (Frieson 1st Dep't Br. at 3, 9, 11; State 1st Dep't Br. at 6-7.)  After Frieson's arrest, two cab drivers identified him as the man who had robbed them.   (Frieson 1st Dep't Br. at 3, 11, 12; State 1st Dep't Br. at 7-8.)

**Pre-Trial Suppression Hearing**

On September 27, 2004, Justice Megan Tallmer conducted a pre-trial suppression hearing to determine, <u>inter alia</u>, whether the police had probable cause to arrest Frieson on September 30, 2002.  (Dkt. No. 16: Suppression Hearing Transcript ("SH."); Dkt. No. 18: Killian Aff. Ex. 1:  Frieson 1st Dep't Br. at 5; Killian Aff. Ex. 2: State 1st Dep't Br. at 4-10.)

### The Prosecution Case at the Suppression Hearing

In September 2002, Detective Arthur Schroeder was investigating a series of yellow-cab robberies in which a robber hailed a cab in Manhattan and traveled to the Yankee Stadium area of the Bronx.  (Dkt. No. 18: Killian Aff. Ex. 1: Frieson 1st Dep't Br. at 3, 6; Killian Aff. Ex. 2: State 1st Dep't Br. at 4-5.)  The victims were Asian drivers and, in most cases, the robber leaned through

the partition separating the front and back seats to put a gun to the driver's head.  (Frieson 1st Dep't Br. at 6-7; State 1st Dep't Br. at 5.)   As part of the investigation, on September 30, 2002, Det. Schroeder waited in an unmarked police car near the Willis Avenue Bridge to observe cabs coming from Manhattan into the Bronx, looking for a thirty-year-old black male suspect about six feet tall and weighing about 200 pounds.  (Frieson 1st Dep't Br. at 5, 6-8; State 1st Dep't Br. at 4-5.)

At about 10:45 p.m., Det. Schroeder saw Frieson riding in the back of a yellow cab going over the bridge entering the Bronx.  (Frieson 1st Dep't Br. at 8; State 1st Dep't Br. at 5.) Det. Schroeder saw Frieson leaning forward with his head through the partition and arguing with the driver.  (Frieson 1st Dep't Br. at 9, 10; State 1st Dep't Br. at 5-6.)  Det. Schroeder followed the cab for three blocks, pulled it over and observed Frieson "'still jumping around, leaning forward, moving around'" in the back of the cab.  (Frieson 1st Dep't Br. at 10; State 1st Dep't Br. at 6.)  The cab driver told the police that Frieson had called him a "'mother fucker'" and asked them to "'check him out.'"  (Frieson 1st Dep't Br. at 11; State 1st Dep't Br. at 6.)  When Det. Schroeder told Frieson to get out of the cab, Frieson asked, "'[w]hat's going on? Is this about my girlfriend?'"  (Frieson 1st Dep't Br. at 11; State 1st Dep't Br. at 6.)  Det. Schroeder saw an imitation pistol on the floor where Frieson was sitting and arrested him.  (Frieson 1st Dep't Br. at 11; State 1st Dep't Br. at 6-7.)

During cross-examination, Frieson's attorney William Flack asked Det. Schroeder the name of the cab driver.  (Dkt. No. 16: SH. 99.)  Det. Schroeder stated that he believed the driver's name was Habib, but would have to look at the complaint report to make sure.  (SH. 99.) The prosecutor objected, but withdrew the objection after Justice Tallmer pointed out that it could only help the prosecution case if the driver's name was Asian as in the pattern robberies.  (SH. 100.)

Frieson's counsel decided not to ask Det. Schroeder to verify the cab driver's name but informed Justice Tallmer that he intended to call the driver as a witness at the hearing.  (SH. 100-01, 163-64.) Justice Tallmer ruled that, under New York law, Frieson's counsel could not call the cab driver as a witness unless he "raise[d] a good-faith basis for asserting that [the witness'] testimony would support [Frieson's] position and contradict" Det. Schroeder.  (SH. 101, 164-65.)

### The Defense Case at the Suppression Hearing

At the close of the prosecution case at the suppression hearing, Frieson's counsel sought to call the cab driver as a witness (Dkt. No. 16: SH. 163-164), but Justice Tallmer held that Frieson's statement through counsel (but as to which he did not testify) that Det. Schroeder's testimony was untruthful did not raise an issue as to probable cause that would require the cab driver's testimony (SH. 164-65).  As a result of this ruling, Frieson decided to testify at the hearing. (SH. 165.)

Frieson testified that on September 30, 2002, he left work in Manhattan and spent a few hours in Central Park.  (Dkt. No. 18: Killian Aff. Ex. 1: Frieson 1st Dep't Br. at 12; Killian Aff. Ex. 2: State 1st Dep't Br. at 8.)  At about 10:30 p.m., Frieson hailed a cab near Fifth Avenue and 66th Street and asked to go to 135th Street and Willis Avenue in the Bronx.  (Frieson 1st Dep't Br. at 13; State 1st Dep't Br. at 8.)  Frieson denied cursing at the driver, leaning toward the cab partition, or possessing an imitation pistol.  (Frieson 1st Dep't Br. at 13; State 1st Dep't Br. at 9.)

### Justice Tallmer's Suppression Hearing Decision

On January 14, 2005, Justice Tallmer issued a written decision holding that the police had reasonable suspicion to stop the cab and probable cause to arrest Frieson after recovering the

imitation pistol.  (Dkt. No. 18: Killian Aff. Ex. 1: Frieson 1st Dep't Br. at 20-21; Killian Aff. Ex 2:

State 1st Dep't Br. at 16-17.)     Finding Frieson unbelievable, Justice Tallmer credited

Det. Schroeder's testimony that:

> "The police saw a . . . cab carrying a male black who was broad and tall and
> who appeared to be 30 years old.  [Frieson] was perched forward on the passenger
> seat with his head through the partition.  He was moving his head back and forth and
> appeared to be having an argument with the driver.  Relying on [Frieson's]
> resemblance to the physical description of the robber, his unusual behavior and the
> fact that he was in a yellow cab entering the Bronx from Manhattan, the police
> suspected that he was the serial robber."

(Frieson 1st Dep't Br. at 20; <u>see</u> State 1st Dep't Br. at 16-17.)

The pre-trial suppression hearing also addressed whether Frieson was deprived of

counsel at his post-arraignment lineups.  (Frieson 1st Dep't Br. at 21-22; State 1st Dep't Br. at 17-

20.)  Prior to deciding this issue, Justice Tallmer conducted an independent source hearing to

determine whether the victims of the September 23 and 25, 2002 robberies had a sufficient

independent basis, aside from the lineup, to identify Frieson at trial.  (Frieson 1st Dep't Br. at 14-15;

State 1st Dep't Br. at 10-12.)  Justice Tallmer denied suppression, finding that Frieson had no right

to counsel at the lineups.  (Frieson 1st Dep't Br. at 21-22; State 1st Dep't Br. at 17-19.)  Since the

victim of the September 23, 2002 robbery testified at the hearing that he had observed the robber's

face numerous times during the incident, Justice Tallmer ruled that that victim would be allowed

to make an in-court identification even if his lineup identification was suppressed.  (Frieson 1st

Dep't Br. at 22; State 1st Dep't Br. at 20.)

**The Trial**

On May 3, 2005, Frieson proceeded to a jury trial before Justice Michael Gross in Supreme Court, Bronx County, for the September 23, 2002 robbery of Mohammed Habib.  (Dkt. No. 18: Killian Aff. Ex. 1: Frieson 1st Dep't Br. at 23; Killian Aff. Ex. 2: State 1st Dep't Br. at 21.)[1]

**The Prosecution Case**

On September 23, 2002 at about 2:00 a.m., Frieson hailed Mohammed Habib's yellow cab near West 47th Street and Seventh Avenue and asked to go to the Bronx.  (Dkt. No. 18: Killian Aff. Ex. 1: Frieson 1st Dep't Br. at 25; Killian Aff. Ex. 2: State 1st Dep't Br. at 21.)  After fifteen to twenty minutes, the cab crossed the Willis Avenue Bridge into the Bronx and Frieson directed Habib to go straight onto the Major Deegan Expressway.  (Frieson 1st Dep't Br. at 26; State 1st Dep't Br. at 22.)

At the 161st Street exit, Frieson told Habib to pull over, pointed a gun at Habib's head and demanded Habib's money.  (Frieson 1st Dep't Br. at 26-27; State 1st Dep't Br. at 22.)  After Habib handed over about $250, Frieson exited the cab and instructed Habib to drive off.  (Frieson 1st Dep't Br. at 27; State 1st Dep't Br. at 22.)  Habib reported the crime  to a nearby police station, describing his assailant as "a slim, 36-year-old African-American man, at least 5'8" tall, and clad in a white shirt, jeans, and a hat," who he would recognize if he saw again.  (State 1st Dep't Br. at

---

[1]   The original indictment charged Frieson with first degree robbery and related charges for both the September 23, 2002 Habib robbery and a September 25, 2002 robbery of another cab driver, and also charged Frieson with unlawfully possessing an imitation pistol on September 30, 2002.  (Frieson 1st Dep't Br. at 3-4; State 1st Dep't Br. at 4.)  On April 9, 2004, Justice William Mogulescu severed the imitation pistol charge from the robbery charges.  (Frieson 1st Dep't Br. at 4-5; State 1st Dep't Br. at 4.)  On April 22, 2005, Justice Ralph Fabrizio severed the September 23rd robbery charges from the September 25th robbery charges.  (Frieson 1st Dep't Br. at 22-23; State 1st Dep't Br. at 4.)

22; Frieson 1st Dep't Br. at 27.)  On October 2, 2002, Habib identified Frieson in a lineup, stating that he "'had memorized [Frieson's] face,'" which was "'imprinted' on his mind."  (Frieson 1st Dep't Br. at 27, 28-29; State 1st Dep't Br. at 23.)  Habib also identified Frieson at trial.  (Dkt. No. 14: Habib: Trial Transcript ("Tr.") 380.)

### Verdict and Sentence

On May 11, 2005, the jury convicted Frieson of first degree robbery.  (Dkt. No. 18: Killian Aff. Ex. 1: Frieson 1st Dep't Br. at 29; Killian Aff. Ex. 2: State 1st Dep't Br. at 24.)

At sentencing on May 25, 2005, Frieson was adjudicated a second-felony offender and sentenced to thirteen years imprisonment.  (Frieson 1st Dep't Br. at 31; State 1st Dep't Br. at 24.) After Justice Gross announced sentence, Frieson pled guilty to the previously severed (see page 6 n.1 above) charges of first degree robbery of a cab driver on September 25, 2002 and possession of an imitation pistol on September 30, 2002.  (Frieson 1st Dep't Br. at 32; State 1st Dep't Br. at 24.) In exchange, Justice Gross sentenced Frieson to thirteen years imprisonment for the September 25, 2002 robbery charge, to run concurrent with his thirteen-year prison term for the September 23, 2002 robbery, as well as time served for the imitation pistol charge.  (Frieson 1st Dep't Br. at 32; State 1st Dep't Br. at 24.)

### Frieson's Direct Appeal

Represented by new counsel (the Center for Appellate Litigation), Frieson appealed to the First Department, claiming inter alia that:  (1) the imitation pistol and lineup identification should have been suppressed because there was no reasonable suspicion to stop the cab (Dkt. No. 18: Killian Aff. Ex. 1: Frieson 1st Dep't Br. at 32-45); and (2) the identification testimony should

have been suppressed because Frieson was denied counsel at the post-arraignment lineups (Frieson 1st Dep't Br. at 45-52).

On January 25, 2007, the First Department unanimously affirmed Frieson's conviction, holding in full:

> The court properly denied [Frieson's] suppression motion. There is no basis for disturbing the court's credibility determinations, which are supported by the record.
>
> [Frieson] was not entitled to counsel at the investigatory lineup involving the robberies, since counsel never entered the matters under investigation and [Frieson] did not request an attorney at the lineup. Although [Frieson] was represented on the imitation pistol charge, that charge did not have the type of relationship to the robbery charges that would trigger [Frieson's] right to counsel at the lineup. The imitation pistol charge arose from a different incident, against a different victim, and occurred five days and eight days, respectively, after the two robberies. It is of no significance that, in other proceedings involving a different context, the People argued that the imitation pistol incident was admissible as proof of the robberies under People v. Molineux; in any event, in each instance, [Frieson] opposed the People's Molineux theory and the court rejected it.
>
> The two evidentiary rulings challenged by [Frieson] on appeal were proper exercises of discretion.
>
> We perceive no basis for reducing the sentence.

People v. Frieson, 36 A.D.3d 542, 542-43, 828 N.Y.S.2d 61, 61 (1st Dep't 2007) (citations omitted).

On July 6, 2007, the New York Court of Appeals denied leave to appeal. People v. Frieson, 9 N.Y.3d 865, 840 N.Y.S.2d 894 (2007).[2]

---

[2]   On May 20, 2008, Frieson filed a pro se coram nobis motion arguing that his appellate counsel was ineffective for various reasons not relevant to his current federal habeas petition. (Dkt. No. 18: Killian Aff. Ex. 5: Frieson Coram Nobis Aff. & Br.) On January 13, 2009, the First Department unanimously denied Frieson's coram nobis motion (Killian Aff. Ex. 8: 1/13/09 1st Dep't Decision), and, on May 21, 2009, the Court of Appeals denied leave to appeal (Killian Aff. Ex. 9: 5/21/09 Ct. App. Cert. Denying Leave to Appeal).

**Frieson's C.P.L. § 440 Motion**

On September 2, 2008, Frieson filed a pro se C.P.L. § 440.10 motion arguing that his trial counsel was ineffective for failing to obtain the name of the cab driver present at his arrest and for failing to investigate and call the driver as a witness at the suppression hearing and trial.  (Dkt. No. 18: Killian Aff. Ex. 10: Frieson 440 Aff. ¶ 1 & Frieson 440 Br. at 13-21, 25.)  Additionally, Frieson claimed that trial counsel was ineffective for failing to object when Justice Tallmer "compelled" Frieson to testify at the suppression hearing.  (Frieson 440 Aff. ¶ 1; Frieson 440 Br. at 8-11, 13, 21-23.)  Frieson also claimed that trial counsel was ineffective for failing to call Frieson's mother, Augusta Frieson Clarke, as an alibi witness at trial.  (Frieson 440 Aff. ¶ 1 & Frieson 440 Br. at 23-24, 26.)

As part of the People's response, Frieson's trial counsel, William Flack, filed an affirmation explaining his strategy at the hearing and trial.  (Killian Aff. Ex. 12: Flack Aff. ¶¶ 6-8.)  Trial counsel Flack noted that, to establish probable cause at the hearing, Det. Schroeder testified that he observed Frieson leaning through the partition and arguing with the driver, but that Frieson had told Flack that Det. Schroeder was not telling the truth.  (Flack Aff. ¶ 8.)  Trial counsel Flack attempted to call the cab driver as a witness at the suppression hearing, hoping that his testimony would contradict Det. Schroeder's account and negate his claims of probable cause.  (Flack Aff. ¶ 8; see page 4 above.)  Flack explained that Justice Tallmer did not allow trial counsel Flack to call the cab driver because, under New York law, "a defendant cannot require the production of a witness at a suppression hearing to testify about an alleged lack of probable cause unless evidence at the hearing had already been presented demonstrating a substantial issue as to the illegality of the arrest."  (Flack Aff. ¶ 8; see page 4 above.)  Justice Tallmer ruled that, without testifying at the

hearing, Frieson's "unsworn contentions were not enough to require the production" of the cab driver.  (Flack Aff. ¶ 8; see page 4 above.)  Trial counsel Flack did not argue with Justice Tallmer's decision because "the court's ruling was correct," and he did not believe that Justice Tallmer was compelling Frieson to testify.  (Flack Aff. ¶ 8.)

Trial counsel Flack discussed Justice Tallmer's ruling with Frieson and explained that it was Frieson's decision whether to testify at the hearing.  (Flack Aff. ¶ 8.)  After Frieson decided to testify, trial counsel Flack reviewed the evidence in the case and determined that the cab driver's testimony "would likely cause more harm than good."  (Flack Aff. ¶ 8.)  Specifically, trial counsel Flack stated that:  (1) Det. Schroeder's paperwork noted that the cab driver was afraid of Frieson, which supported Det. Schroeder's testimony that they had been arguing; (2) the cab driver might have testified that the imitation pistol was not his, or worse, that he had checked his cab prior to Frieson entering and had not seen an imitation pistol; (3) the cab driver might have testified that the route he had taken with Frieson was similar to those in the pattern robberies; and (4) Flack "believed" that the cab driver was Asian, fitting the other pattern robberies.  (Flack Aff. ¶ 8.)  Trial counsel Flack decided not to call the cab driver as a witness for these reasons.  (Flack Aff. ¶ 8.)

As to Frieson's alibi, trial counsel Flack noted that, while Clarke had stated during their first phone conversation that Frieson was "at home with her when the charged crimes occurred," she admitted in a later interview that she was "sleeping in her home when the charged crimes occurred, and she could not verify if Mr. Frieson was at her home at that time."  (Flack Aff. ¶ 9.)  Trial counsel Flack decided not to call Clarke because he "knew" that she "could not provide Mr. Frieson with an alibi."  (Flack Aff. ¶ 9.)

On March 1, 2009, Frieson submitted an affidavit from his mother claiming that she had told trial counsel Flack that Frieson had been home with her at the time of the September 23, 2002 and September 25, 2002 robberies "because he had injured his legs in an accident and was on crutches the entire time." (Killian Aff. Ex. 14: Clarke Aff.)  Clarke also claimed that she never told trial counsel Flack that she was sleeping or was unsure of where Frieson was during those times, and that attorney Flack never contacted her again after their first conversation.  (Clarke Aff.)

### Justice Gross' April 2, 2009 C.P.L. § 440 Decision

On April 2, 2009, Justice Gross denied Frieson's ineffective assistance claims relating to the cab driver.  (Dkt. No. 18: Killian Aff. Ex. 15: Justice Gross 4/2/09 Decision at 8-14.)  Justice Gross found that trial counsel Flack had "fully explored the possibility of presenting" the cab driver as a witness at the suppression hearing, but ultimately decided against it for tactical reasons "to avoid strengthening the People's case."  (Justice Gross 4/2/09 Decision at 11-14.)  Justice Gross credited trial counsel Flack's rationale that the cab driver's potential testimony (i.e., that he was afraid of Frieson, that the imitation pistol was not in the cab before Frieson entered, the route he had taken into the Bronx and that he was Asian) could have been harmful to Frieson.  (Justice Gross 4/2/09 Decision at 12-14.)  Moreover, Justice Gross found that Frieson "freely and voluntarily" decided to testify and was not "'compelled'" by Justice Tallmer.  (Justice Gross 4/2/09  Decision at 10.)  Finally, Justice Gross found no Brady violation because "the record is devoid of evidence to establish that the driver's testimony would have been favorable" to Frieson.  (Justice Gross 4/2/09 Decision at 13 n.3.)

**The C.P.L. § 440 Hearing**

      As part of his decision, Justice Gross granted a hearing on Frieson's alibi claim because of the conflicting affidavits from Clarke and trial counsel Flack.  (Dkt. No. 18: Killian Aff. Ex. 15: Justice Gross 4/2/09 Decision at 14-16.)  Justice Gross appointed counsel for Frieson, and Clarke testified at the September 30, 2009 C.P.L. § 440 hearing that Frieson and her daughter lived with her in September 2002 and described her usual bedtime routine of checking that her son and daughter were in bed and locking the front door.  (Dkt. No. 17: Clarke: C.P.L. § 440 Hearing Transcript ("H.") 1-2, 6-7, 17, 19-20.)  Clarke stated that the front door required keys to get in or out of her apartment, and that she did not give her children keys because "sometimes they would take [her] keys and leave it at somebody's house."  (Clarke: H. 7-9, 20-21.)  If her children were not in the house at around 10:00 or 11:00 p.m. they would be locked out, and they would have needed permission to leave the house at night.  (Clarke: H. 8-9, 21-22.)  When pressed to explain her "rules and regulations," she stated that "[w]hen they're in school, and they have to do their homework, they got to be in bed at a certain time," but did not explain how that was relevant when Frieson was forty years old.  (Clarke: H. 9, 10, 22.)

      Clarke stated that she did not remember a night in September 2002 that Frieson was not home when she locked the door.  (Clarke: H. 10, 13, 21-22.)  Clarke testified that she told attorney Flack that Frieson was home with her at the time of the robberies.  (Clarke: H. 13-15, 24.)  Clarke also testified that, although Frieson had seriously injured his legs by scraping off the skin from both legs and ankles in August 2002, Frieson was healing and no longer needed crutches in September 2002.  (Clarke: H. 10, 25-27.)  Acknowledging that her affidavit claimed that Frieson

was still on crutches in September, Clarke explained this contradiction by saying that her son had prepared the affidavit for her.  (Clarke: H. 27, 32.)

Frieson's trial counsel Flack testified that, when he first spoke with Clarke, she told him that Frieson was at home with her on September 23, 2002 and that she was willing to testify as an alibi witness.  (Flack: H. 47-49, 50-51, 65, 67.)   During a second phone conversation, however, Clarke told Flack that "she wouldn't be a particularly good witness because it was late at night, and she was sleeping and didn't know when [Frieson] came and went," and that she did not want to testify.  (Flack: H. 52-54, 70-74.)  Moreover, Clarke told Flack that she had no specific recollection of September 23, 2002, and that Frieson would sometimes sleep somewhere else and not come home at night.  (Flack: H. 53, 72-73.)  After this conversation, trial counsel Flack determined that it was too risky to present Clarke as an alibi witness because of her inability to specifically recall Frieson's whereabouts at the time of the robberies.  (Flack: H. 53, 70-73)  Trial counsel Flack explained:

> Well, I had tried numerous alibi cases.  And my concern was that if a defendant, notwithstanding what the court charges about the People's burden of proof, if the defendant puts on a witness that a jury doesn't believe, it is a dangerous situation because it creates doubt in the jury that the defendant is, notwithstanding the charge by the court, that the defendant is untruthful and he's hiding something.

(Flack: H. 53.)  Trial counsel Flack explained "the situation" to Frieson and also discussed the defense strategy of discrediting the eyewitness identification; Frieson did not express any disagreement.  (Flack: H. 55-56, 73.)

Trial counsel Flack further testified that Clarke never mentioned that Frieson was on crutches.  (Flack: H. 57.)  While Frieson had told trial counsel Flack about his August 2002 leg injury, the medical records indicated that Frieson had recovered by the time of the robberies in late

September 2002.  (Flack: H. 57-59.)  Trial counsel Flack also noted that Frieson had "none of the symptoms of" a leg injury when he was arrested on September 30, 2002.  (Flack: H. 58.)

### Justice Gross' April 13, 2010 C.P.L. § 440 Opinion

On April 13, 2010, Justice Gross denied Frieson's § 440 alibi argument, finding that Clarke "did not recall the events of September 23, 2002, and did not have any specific recollection as to whether [Frieson] was actually at home with her at the time of the robbery." People v. Frieson, No. 5264/02, 27 Misc.3d 1208(A) (table), 2010 WL 1459470 at *4, *9 (Sup. Ct. Bronx Co. Apr. 13, 2010).  Although Clarke claimed that she told trial counsel Flack that Frieson "was always at home with her every evening," Justice Gross credited Flack's testimony that Clarke had told him that "she did not know when [Frieson] had entered or left her apartment that evening, and that [Frieson] did not always sleep at home." People v. Frieson, 2010 WL 1459470 at *4, *9.

Justice Gross found Clarke's testimony incredible that Frieson, a forty-year-old man, was "forbidden to go out at night because of Clarke's 'rules and regulations'":

> In light of the fact that defendant resided with his mother for most of his life, it is difficult to believe that he was always at home every night by 11 p.m.  Clarke's claim that she had used "force" upon both of her adult children to ensure that they lived by her rules was also not credible.

People v. Frieson, 2010 WL 1459470 at *4.  Justice Gross found that it was "most unlikely" that Frieson did not have keys to the front door and could not come and go as he pleased. People v. Frieson, 2010 WL 1459470 at *4.  Justice Gross also noted that, "[i]n referring to her 'rules and regulations,' and her 'curfews' on school nights, Clarke testified as if she were referring to a school-age child and not a forty-year-old man." People v. Frieson, 2010 WL 1459470 at *4.

Furthermore, Justice Gross noted that "[i]n addition to the extremely unlikely aspects of her account, Clarke's testimony conflicted with her sworn affidavit submitted in support of

[Frieson's] motion." <u>People</u> v. <u>Frieson</u>, 2010 WL 1459470 at *5.  Clarke's affidavit stated that Frieson was home at the time of the September 2002 robberies "because 'he had injured his legs in an accident and was on crutches the entire time'"; at the § 440 hearing, however, Clarke testified that Frieson was healing in September 2002 and no longer needed crutches, and that he was home at night because of her "rules and regulations." <u>People</u> v. <u>Frieson</u>, 2010 WL 1459470 at *5, *9; <u>see</u> page 12 above.

      In contrast, Justice Gross stated that there was "no reason to doubt the veracity of" trial counsel Flack and credited Flack's testimony (<u>see</u> page 13 above) that, during a second conversation, Clarke "recanted her earlier statements[] and admitted that she was asleep at the time of the robbery." <u>People</u> v. <u>Frieson</u>, 2010 WL 1459470 at *5, *9.  Justice Gross found "it is certainly believable that Clarke would have been asleep between 2:00 a.m. and 2:30 a.m., and thus, unaware of whether [Frieson] was actually at home at that time." <u>People</u> v. <u>Frieson</u>, 2010 WL 1459470 at *5.  Justice Gross further noted that "unlike Clarke, Flack has no motive to falsify his testimony regarding this second conversation." <u>People</u> v. <u>Frieson</u>, 2010 WL 1459470 at *5.

      Justice Gross also stated that, "given the relative weakness of the People's trial evidence" (<u>i.e.</u>, one witness identification and no physical evidence), trial counsel Flack's "decision to focus on the issue of reasonable doubt was clearly a logical strategy." <u>People</u> v. <u>Frieson</u>, 2010 WL 1459470 at *10.  Justice Gross found that Flack "fully explored" the alibi defense and that his decision to forego the defense was a "strategic" and "thoughtful, tactical decision." <u>People</u> v. <u>Frieson</u>, 2010 WL 1459470 at *5, *9.

      Additionally, Justice Gross denied Frieson's motion to reargue the ineffective assistance of counsel claim regarding the cab driver (Dkt. No. 18: Killian Aff. Ex. 16: Motion to

Reargue Aff. ¶ 1 & Motion to Reargue Br. at 4-9; see also pages 9-10 above) as untimely and for failing to establish that the court had overlooked matters of fact or law in its decision.  People v. Frieson, 2010 WL 1459470 at *6.  Justice Gross also rejected the claim on the merits, finding that trial counsel Flack's overall representation was effective and, even assuming Flack should have investigated the cab driver and called him as a witness, "such isolated errors do not rise to the level of ineffective assistance since counsel's performance must be viewed in its entirety."  People v. Frieson, 2010 WL 1459470 at *6-7.  Moreover, Justice Gross found that Frieson was not prejudiced by trial counsel Flack's alleged failure because the outcome of Frieson's trial would have been the same even if the cab driver had testified.  People v. Frieson, 2010 WL 1459470 at *8.  Justice Gross noted that, at best, the cab driver would have impeached Det. Schroeder's testimony and led Justice Tallmer to suppress the imitation pistol and the lineup identification.  People v. Frieson, 2010 WL 1459470 at *8.  This would not have affected Frieson's trial, however, since the imitation pistol was not admissible at Frieson's trial (see pages 30-31 & n.19 below), and Justice Tallmer had previously ruled, based on the independent source hearing (see page 5 above), that the victim of the September 23, 2002 cab robbery would have been allowed to make an in-court identification even if the line up was suppressed.  People v. Frieson, 2010 WL 1459470 at *8.

On June 15, 2010, Frieson's counsel submitted a letter to the First Department seeking leave to appeal Justice Gross' April 13, 2010 C.P.L. § 440 decision, arguing that (1) trial counsel Flack was ineffective for failing to investigate or speak to the cab driver "to learn his potential value as a witness"; and (2) in denying Frieson's alibi claim, Justice Gross "incorrectly credited" trial counsel Flack's "vague, evasive and incomplete testimony" and "disregarded the candid and credible testimony Ms. Clarke would have presented to a jury." (Dkt. No. 20: 1st Dep't

Leave Letter at 5-11.)   On September 20, 2010, the First Department denied leave to appeal. (Killian Aff. Ex. 19: 1st Dep't Cert. Denying Leave.)

**Frieson's Federal Habeas Petition**

On December 23, 2010, Frieson filed his pro se federal habeas corpus petition arguing that:  (1) the prosecutor withheld Brady evidence and discovery material at the suppression hearing and trial (Dkt. No. 1: Frieson Pet. Att. at 1-2; Dkt. No. 19: Frieson Traverse at 1-6); (2) Frieson's trial counsel Flack was ineffective for failing to:  (a) obtain the identity of the driver of the cab Frieson was riding in when he was arrested (Frieson Pet. Att. at 2, 8-9; Frieson Traverse at 11-15, 23-25); (b) investigate and call the cab driver as a witness during the suppression hearing and trial (Frieson Pet. Att. at 4-5, 8-9, 13-15; Frieson Traverse at 6-15, 23-25); and (c) call Frieson's mother as an alibi witness at trial (Frieson Br. at 8, 9-12, 16-18; Frieson Traverse at 11, 15-23, 25, 26-27).

## ANALYSIS

I.     **THE AEDPA REVIEW STANDARD**

Before the Court can determine whether petitioner is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners."  Williams v. Taylor, 529 U.S. 362, 403, 120 S. Ct. 1495, 1518 (2000).  The AEDPA imposed a more stringent review standard, as follows:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).[3/]

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." Williams v. Taylor, 529 U.S. at 404-05, 120 S. Ct. at 1519.[4/]  Both, however, "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." Williams v. Taylor, 529 U.S. at 412, 120 S. Ct. at 1523.[5/]  "That federal law, as defined by the

---

[3/]   See also, e.g., Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011); Knowles v. Mirzayance, 129 S. Ct. 1411, 1418 (2009); Portalatin v. Graham, 624 F.3d 69, 78-79 (2d Cir. 2010) (en banc), cert. denied, 131 S. Ct. 1693 (2011); Henry v. Poole, 409 F.3d 48, 67 (2d Cir. 2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622 (2006); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004); Dallio v. Spitzer, 343 F.3d 553, 559-60 (2d Cir. 2003), cert. denied, 541 U.S. 961, 124 S. Ct. 1713 (2004); Eze v. Senkowski, 321 F.3d 110, 120 (2d Cir. 2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.'" (quoting Lainfiesta v. Artuz, 253 F.3d 151, 155 (2d Cir. 2001), cert. denied, 535 U.S. 1019, 122 S. Ct. 1611 (2002))).

[4/]   Accord, e.g., Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir.), cert. denied, 540 U.S. 1091, 124 S. Ct. 962 (2003); Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000); Lurie v. Wittner, 228 F.3d 113, 125 (2d Cir. 2000), cert. denied, 532 U.S. 943, 121 S. Ct. 1404 (2001); Clark v. Stinson, 214 F.3d 315, 320 (2d Cir. 2000), cert. denied, 531 U.S. 1116, 121 S. Ct. 865 (2001).

[5/]   Accord, e.g., Carey v. Musladin, 549 U.S. 70, 77, 127 S. Ct. 649, 654 (2006) ("Given the lack of holdings from this Court regarding [this issue], it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"); Yarborough v. Alvarado, 541 U.S. 652, 661, 124 S. Ct. 2140, 2147 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); Wiggins v. Smith, 539 U.S. 510, 519, 123 S. Ct. 2527, 2534 (2003); Lockyer v. Andrade, 538 U.S. 63, 71, 123 S. Ct. 1166, 1172 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as (continued...)

Supreme Court, may be either a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." Kennaugh v. Miller, 289 F.3d at 42; accord, e.g., Davis v. Grant, 532 F.3d 132, 140 (2d Cir. 2008), cert. denied, 129 S. Ct. 1312 (2009). "A petitioner can not win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." Yung v. Walker, 341 F.3d at 110; accord, e.g., DelValle v. Armstrong, 306 F.3d at 1200.

> As to the "contrary to" clause:
>
> A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases. . . . A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

Williams v. Taylor, 529 U.S. at 405-06, 120 S. Ct. at 1519-20.[6]

---

[5]   (...continued)
of the time of the relevant state-court decision.'"); Portalatin v. Graham, 624 F.3d at 79 ("To qualify as 'clearly established' for the purposes of federal habeas review, a rule of law must be embodied in the 'holdings, as opposed to the dicta,' of Supreme Court precedent."); Georgison v. Donelli, 588 F.3d 145, 153-54 (2d Cir. 2009); Dunlap v. Burge, 583 F.3d 160, 164 (2d Cir.), cert. denied, 130 S. Ct. 642 (2009); Hargett v. Giambruno, 291 F. App'x 402, 403 (2d Cir. 2008); Howard v. Walker, 406 F.3d at 122; Tueros v. Greiner, 343 F.3d 587, 591 (2d Cir. 2003), cert. denied, 541 U.S. 1047, 124 S. Ct. 2171 (2004); Yung v. Walker, 341 F.3d 104, 109-10 (2d Cir. 2003); Parsad v. Greiner, 337 F.3d at 181; DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002); Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir.), cert. denied, 537 U.S. 909, 123 S. Ct. 251 (2002); Loliscio v. Goord, 263 F.3d 178, 184 (2d Cir. 2001); Sellan v. Kuhlman, 261 F.3d 303, 309 (2d Cir. 2001).

[6]   Accord, e.g., Knowles v. Mirzayance, 129 S. Ct. at 1419 (The Supreme "Court has held on numerous occasions that it is not 'an unreasonable application of clearly established federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this [Supreme] Court." (quotation omitted)); Brown v. Payton, 544 U.S. 133, 141, 125 S. Ct. 1432, 1438-39 (2005); Bell v. Cone, 543 U.S. 447, 452-53, 125 S. Ct. 847, (continued...)

In <u>Williams</u>, the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 413, 120 S. Ct. at 1523.[7/] However, "[t]he term 'unreasonable' is . . . difficult to define." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 410, 120 S. Ct. at 1522. The Supreme Court made clear that "an <u>unreasonable</u> application of federal law is different from an <u>incorrect</u> application of federal law." <u>Id</u>.[8/] Rather, the issue is "whether the state court's

---

[6/]    (...continued)
851 (2005); <u>Price</u> v. <u>Vincent</u>, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853 (2003); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 73-74, 123 S. Ct. at 1173-74; <u>Portalatin</u> v. <u>Graham</u>, 624 F.3d at 79; <u>Bierenbaum</u> v. <u>Graham</u>, 607 F.3d 36, 47-48 (2d Cir. 2010), <u>cert. denied</u>, 131 S. Ct. 1693 (2011); <u>Ortiz</u> v. <u>N.Y.S. Parole in Bronx, N.Y.</u>, 586 F.3d 149, 156 (2d Cir. 2009), <u>cert. denied</u>, 131 S. Ct. 320 (2010); <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d at 164; <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d 238, 242 (2d Cir. 2006), <u>cert. denied</u>, 549 U.S. 1215, 127 S. Ct. 1267 (2007); <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d 210, 219 (2d Cir.), <u>cert. denied</u>, 546 U.S. 889, 126 S. Ct. 215 (2005); <u>Tueros</u> v. <u>Greiner</u>, 343 F.3d at 591; <u>Yung</u> v. <u>Walker</u>, 341 F.3d at 109; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d at 1200; <u>Kennaugh</u> v. <u>Miller</u>, 289 F.3d at 42; <u>Loliscio</u> v. <u>Goord</u>, 263 F.3d at 184; <u>Lurie</u> v. <u>Wittner</u>, 228 F.3d at 127-28.

[7/]    Accord, <u>e.g.</u>, <u>Cullen</u> v. <u>Pinholster</u>, 131 S. Ct. at 1399; <u>Waddington</u> v. <u>Sarausad</u>, 555 U.S. 179, 129 S. Ct. 823, 831 (2009); <u>Brown</u> v. <u>Payton</u>, 544 U.S. at 141, 125 S. Ct. at 1439; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2534-35; <u>Bierenbaum</u> v. <u>Graham</u>, 607 F.3d at 48; <u>Brisco</u> v. <u>Ercole</u>, 565 F.3d 80, 87 (2d Cir.), <u>cert. denied</u>, 130 S. Ct. 739 (2009); <u>Jones</u> v. <u>West</u>, 555 F.3d 90, 96 (2d Cir. 2009); <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d 238, 246 (2d Cir. 2006), <u>cert. denied</u>, 549 U.S. 1257, 127 S. Ct. 1383 (2007); <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181.

[8/]    <u>See also</u>, <u>e.g.</u>, <u>Renico</u> v. <u>Lett</u>, 130 S. Ct. 1855, 1862 (2010); <u>Waddington</u> v. <u>Sarausad</u>, 129 S. Ct. at 831; <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2150; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2535; <u>Price</u> v. <u>Vincent</u>, 538 U.S. at 641, 123 S. Ct. at 1853 ("As we have explained: '[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'" (quoting <u>Woodford</u> v. <u>Visciotti</u>, 537 U.S. 19, 24-25, 123 S. Ct. 357, 360 (2002))); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1175; <u>Dunlap</u>
(continued...)

application of clearly established federal law was objectively unreasonable."  Williams v. Taylor,

529 U.S. at 409, 120 S. Ct. at 1521.[8]  "Objectively unreasonable" is different from "clear error."

Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1175 ("The gloss of clear error fails to give proper

deference to state courts by conflating error (even clear error) with unreasonableness.").  This is a

"'substantially higher threshold'" than incorrectness.  Renico v. Lett, 130 S. Ct. at 1862; accord, e.g.,

Knowles v. Mirzayance, 129 S. Ct. at 1420.[10]  Federal habeas relief is precluded "so long as

---

[8]      (...continued)
         v. Burge, 583 F.3d at 165-66 (A "federal court might agree with a petitioner that the relevant
         federal law should have been interpreted differently than the way it was interpreted by the
         state court yet still conclude that the state court's application of the federal law was not
         unreasonable."); Brisco v. Ercole, 565 F.3d at 87-88; Jones v. West, 555 F.3d at 96; Davis
         v. Grant, 532 F.3d at 140; Hawkins v. Costello, 460 F.3d at 243; Lynn v. Bliden, 443 F.3d
         at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray,
         396 F.3d at 219; Cox v. Donnelly, 387 F.3d at 197; Eze v. Senkowski, 321 F.3d at 124-25;
         DelValle v. Armstrong, 306 F.3d at 1200 ("With regard to issues of law, therefore, if the
         state court's decision was not an unreasonable application of, or contrary to, clearly
         established federal law as defined by Section 2254(d), we may not grant habeas relief even
         if in our judgment its application was erroneous.").

[9]      Accord, e.g., Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2150; Wiggins v.
         Smith, 539 U.S. at 520-21, 123 S. Ct. at 2535; Price v. Vincent, 538 U.S. at 641, 123 S. Ct.
         at 1853; Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1174-75; Woodford v. Visciotti,
         537 U.S. at 25-27, 123 S. Ct. at 360-61; Portalatin v. Graham, 624 F.3d at 79; Dunlap v.
         Burge, 583 F.3d at 165; Davis v. Grant, 532 F.3d at 140; Mosby v. Senkowski, 470 F.3d 515,
         519 (2d Cir. 2006), cert. denied, 552 U.S. 836, 128 S. Ct. 75 (2007); Hawkins v. Costello,
         460 F.3d at 243; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard
         v. Walker, 406 F.3d at 122; Cox v. Donnelly, 387 F.3d at 197; Eze v. Senkowski, 321 F.3d
         at 125; Ryan v. Miller, 303 F.3d 231, 245 (2d Cir. 2002); Loliscio v. Goord, 263 F.3d at 184;
         Lurie v. Wittner, 228 F.3d at 128-29.

[10]     However, the Second Circuit has explained "that while '[s]ome increment of incorrectness
         beyond error is required . . . the increment need not be great; otherwise, habeas relief would
         be limited to state court decisions so far off the mark as to suggest judicial incompetence.'"
         Jones v. Stinson, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir.
         2000)); accord, e.g., Brisco v. Ercole, 565 F.3d at 88; Jones v. West, 555 F.3d at 96; Brown
         v. Alexander, 543 F.3d 94, 100 (2d Cir. 2008) ("[W]e have observed that the 'unreasonable
                                                                                    (continued...)

'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011). "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings.'" Cullen v. Pinholster, 131 S. Ct. at 1398 (citations omitted).

"[T]he range of reasonable judgment can depend in part on the nature of the relevant rule." Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2149.[11/] "Even if the state court issued a decision 'contrary to' clearly established Supreme Court law, a petitioner 'cannot obtain relief . . . unless application of a correct interpretation of that [Supreme Court] decision leads to the conclusion that his rights were violated.'" Cousin v. Bennett, 511 F.3d 334, 339 (2d Cir.), cert. denied, 553 U.S. 1096, 128 S. Ct. 2910 (2008) (citation omitted).

---

[10/]  (...continued)
application' standard 'falls somewhere between merely erroneous and unreasonable to all reasonable jurists.'"); Davis v. Grant, 532 F.3d at 140; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 219; Cox v. Donnelly, 387 F.3d at 197, 200-01; Yung v. Walker, 341 F.3d at 110; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d at 245; Loliscio v. Goord, 263 F.3d at 184.

[11/]  The Supreme Court explained:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Yarborough v. Alvarado, 541 U.S. at 664, 124 S. Ct. at 2149; accord, e.g., Harrington v. Richter, 131 S. Ct. at 786; Renico v. Lett, 130 S. Ct. at 1864; Knowles v. Mirzayance, 129 S. Ct. at 1420 (Where the Supreme Court "standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."); Portalatin v. Graham, 624 F.3d at 79; Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d at 157; Dunlap v. Burge, 583 F.3d at 166; Hawkins v. Costello, 460 F.3d at 243.

Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." Kennaugh v. Miller, 289 F.3d at 45.[12]

Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." Yung v. Walker, 341 F.3d at 109; accord, e.g., Cullen v. Pinholster, 131 S. Ct. at 1398; Felkner v. Jackson, 131 S. Ct. 1305, 1307 (2011) (per curiam) ("On federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" (citations omitted)); Renico v. Lett, 130 S. Ct. at 1862; Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853; Mosby v. Senkowski, 470 F.3d at 519. "[I]t is the petitioner's burden to demonstrate that the state court applied the relevant clearly established law to th[e] record in an unreasonable manner." Acosta v. Artuz, 575 F.3d 177, 184 (2d Cir. 2009); accord, e.g., Cullen v. Pinholster, 131 S. Ct. at 1398 ("The petitioner carries the burden of proof."); Georgison v. Donelli, 588 F.3d at 154. As the Supreme Court explained:

> If this standard is difficult to meet, that is because it was meant to be. . . . [§ 2254(d)] preserves authority to issue the writ in cases where there is no possibility

---

[12]  Accord, e.g., Bierenbaum v. Graham, 607 F.3d at 47-48; Davis v. Grant, 532 F.3d at 140-41; Tueros v. Greiner, 343 F.3d at 591; Yung v. Walker, 341 F.3d at 109; see Yarborough v. Alvarado, 541 U.S. at 665-66, 124 S. Ct. at 2150-51 ("The petitioner contends that if a habeas court must extend a rationale before it can apply to the facts at hand then the rationale cannot be clearly established at the time of the state-court decision. There is force to this argument. Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law. At the same time, the difference between applying a rule and extending it is not always clear. Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." (citations omitted)).

> fairminded jurists could disagree that the state court's decisions conflict with [the Supreme] Court's precedents.  It goes no further. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Harrington v. Richter, 131 S. Ct. at 786-87.

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies.

> Determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.  And as this Court has observed, a state court need not cite or even be aware of [Supreme Court] cases under § 2254(d).  Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.

Harrington v. Richter, 131 S. Ct. at 784 (citations to Sellan v. Kuhlman, 261 F.3d at 312, & other cases omitted); accord, e.g., Cullen v. Pinholster, 131 S. Ct. at 1402; Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853; Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (State court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them."); Wilson v. Mazzuca, 570 F.3d 490, 499 (2d Cir. 2009) ("Where, as here, 'a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an unreasonable application of clearly established Supreme Court precedent.'").[13]  "'[A] habeas court must determine

---

[13]    See also, e.g., Wade v. Herbert, 391 F.3d 135, 140, 142 (2d Cir. 2004) (Appellate Division held claim was "'without merit.'"  "Such a summary determination, even absent citation of federal case law, is a determination 'on the merits' and as such requires the deference (continued...)

what arguments or theories . . . could have supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court.'" <u>Cullen</u> v. <u>Pinholster</u>, 131 S. Ct. at 1402.

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Harrington</u> v. <u>Richter</u>, 131 S. Ct. at 784-85.

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." <u>Cullen</u> v. <u>Pinholster</u>, 131 S. Ct. at 1398.

Finally, in appropriate circumstances, "[i]f [the] court finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless." <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122.

In addition to the standard of review of legal issues, the AEDPA provides a deferential review standard for state court factual determinations: "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); <u>accord</u>, <u>e.g.</u>, <u>Bierenbaum</u> v. <u>Graham</u>, 607 F.3d at 48; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246-47; <u>Rosa</u> v. <u>McCray</u>, 396

---

<u>13/</u>   (...continued)
specified by § 2254." Moreover, "[i]f any reasonable ground was available [for the state court's decision], we must assume the [state] court relied on it."); <u>Francolino</u> v. <u>Kuhlman</u>, 365 F.3d 137, 141 (2d Cir.) (Where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims,'" AEDPA deference applies.), <u>cert. denied</u>, 543 U.S. 872, 125 S. Ct. 110 (2004); <u>Jenkins</u> v. <u>Artuz</u>, 294 F.3d 284, 291 (2d Cir. 2002) ("In <u>Sellan</u>, we found that an even more concise Appellate Division disposition-the word 'denied'-triggered AEDPA deference.").

F.3d at 220.  "The petitioner bears the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'"  Parsad v. Greiner, 337 F.3d at 181 (quoting § 2254(e)(1)); accord, e.g., Bierenbaum v. Graham, 607 F.3d at 48 ("A state court's determination of a factual issue is presumed to be correct, and may only be rebutted by clear and convincing evidence."); Brown v. Alexander, 543 F.3d at 100; Lynn v. Bliden, 443 F.3d at 246-47.

## II.  FRIESON'S BRADY-RELATED CLAIMS ARE MERITLESS

Frieson claims that the prosecutor withheld Brady evidence and discovery material at the suppression hearing and trial.  (Dkt. No. 1: Frieson Pet. Att. at 1-2; Dkt. No. 19: Frieson Traverse at 1-6.)  Specifically, Frieson claims that the prosecutor failed to provide trial counsel Flack with the name of the cab driver present at Frieson's arrest and improperly withheld Det. Schroeder's memo book that contained that information.  (Frieson Pet. Att. at 1-2; Frieson Traverse at 1, 4-6.)  Frieson argues that, if called to testify, the cab driver would have negated the basis for the stop by contradicting Det. Schroeder's testimony that Frieson was leaning through the partition and arguing with the driver.  (Frieson Pet. Att. at 4-5; Frieson Traverse at 2-4)  Frieson contends that without knowing the cab driver's name, trial counsel Flack was unable to call him as a witness.  (Frieson Pet. Att. at 1-2; Frieson Traverse at 6-10, 24-25.)

A.      **The Brady v. Maryland Standard**[14]

Under Brady v. Maryland and its progeny, state as well as federal prosecutors must turn over exculpatory and impeachment evidence, whether or not requested by the defense, where the evidence is material either to guilt or to punishment.  See, e.g., Strickler v. Greene, 527 U.S. 263, 280, 119 S. Ct. 1936, 1948 (1999); United States v. Bagley, 473 U.S. 667, 676, 682, 105 S. Ct. 3375, 3380, 3383-84 (1985); United States v. Agurs, 427 U.S. 97, 107, 96 S. Ct. 2392, 2399 (1976); Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963).[15]  The Brady rule also encompasses

---

[14]     As an initial matter, to the extent Frieson alleges that the prosecutor violated New York's disclosure rules under People v. Rosario, 9 N.Y.2d 286, 289-91, 213 N.Y.S.2d 448, 450-52 (requiring the prosecutor to provide a criminal defendant with any prior written or recorded statements made by a prosecution witness), cert. denied, 368 U.S. 866, 82 S. Ct. 117 (1961); see also C.P.L. § 240.45(1)(a), by not turning over Det. Schroeder's memo book, this claim "must fail, because a habeas petition can only be granted to remedy some violation of federal law; the obligation to turn over Rosario material arises under state law."  Landy v. Costello, No. 97-2433, 131 F.3d 1151 (table), 1998 WL 105768 at *1 (2d Cir. Mar. 9, 1998); see also, e.g., Harris v. Smith, 06 Civ. 7824, 2011 WL 781128 at *7 (S.D.N.Y. Jan. 5, 2011) (Rosario claims "are grounded in state case-law and statute; as such, they are not cognizable on federal habeas review."), report & rec. adopted, 2011 WL 797492 (S.D.N.Y. Mar. 7, 2011); Shomo v. Zon, 05 Civ. 10337, 2008 WL 2981555 at *10 n.5 (S.D.N.Y. Aug. 1, 2008) ("Although Brady violation claims are subject to federal review, Rosario claims are not because they are based solely on state law."); Mitchell v. Artus, 07 Civ. 4688, 2008 WL 2262606 at *34 n.52 (S.D.N.Y. June 2, 2008) (Peck, M.J.) ("Although [petitioner] claims that the prosecution committed both a Brady and Rosario violation . . . , this Court only will discuss [petitioner's] Brady claim because Rosario is a state law matter."), report & rec. adopted, 2008 WL 3884373 (S.D.N.Y. Aug. 21, 2008); Van Stuyvesant v. Conway, 03 Civ. 3856, 2007 WL 2584775 at *21 (S.D.N.Y. Sept. 7, 2007) (Rosario violation claim is not cognizable on habeas review because it "does not implicate a federal constitutional right."); Ellis v. Phillips, 04 Civ. 7988, 2005 WL 1637826 at *27 (S.D.N.Y. July 13, 2005) (Peck, M.J.) ("While the federal Brady rule . . . and New York's Rosario rule . . . overlap considerably, they are not identical, and Rosario (as opposed to Brady) claims are not cognizable on habeas review." (citing cases)).

[15]     See also, e.g., United States v. Jackson, 345 F.3d 59, 70 (2d Cir. 2003), cert. denied, 541 U.S. 956, 124 S. Ct. 1705 (2004); Shabazz v. Artuz, 336 F.3d 154, 161-62 (2d Cir. 2003); United States v. Gil, 297 F.3d 93, 101, 103 (2d Cir. 2002); United States v. Coppa, 267 F.3d
(continued...)

evidence known only to the police:  "In order to comply with <u>Brady</u>, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'"  <u>Strickler</u> v. <u>Greene</u>, 527 U.S. at 281, 119 S. Ct. at 1948 (quoting <u>Kyles</u> v. <u>Whitley</u>, 514 U.S. 419, 437, 115 S. Ct. 1555, 1567 (1995)).

The <u>Brady</u> rule does not require a prosecutor to "deliver his entire file to defense counsel," but only to disclose those items which are material to the defendant's guilt or punishment. <u>United States</u> v. <u>Bagley</u>, 473 U.S. at 675, 105 S. Ct. at 3380; <u>accord</u>, <u>e.g.</u>, <u>Kyles</u> v. <u>Whitley</u>, 514 U.S. at 437, 115 S. Ct. at 1567 ("We have never held that the Constitution demands an open file policy."); <u>United States</u> v. <u>Agurs</u>, 427 U.S. at 108-09, 96 S. Ct. at 2400.[16]

"There are three components of a true <u>Brady</u> violation:  [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued."  <u>Strickler</u> v. <u>Greene</u>, 527 U.S. at 281-82, 119 S. Ct. at 1948.[17]

---

[15]  (...continued)
132, 135, 139 (2d Cir. 2001); <u>United States</u> v. <u>Diaz</u>, 176 F.3d 52, 108 (2d Cir.), <u>cert. denied</u>, 528 U.S. 875, 120 S. Ct. 181 (1999); <u>Tankleff</u> v. <u>Senkowski</u>, 135 F.3d 235, 250 (2d Cir. 1998); <u>Orena</u> v. <u>United States</u>, 956 F. Supp. 1071, 1090-92 (E.D.N.Y. 1997) (Weinstein, D.J.).

[16]  <u>See also</u>, <u>e.g.</u>, <u>United States</u> v. <u>Coppa</u>, 267 F.3d at 135; <u>Tate</u> v. <u>Wood</u>, 963 F.2d 20, 25 (2d Cir. 1992); <u>United States</u> v. <u>Gaggi</u>, 811 F.2d 47, 59 (2d Cir.), <u>cert. denied</u>, 482 U.S. 929, 107 S. Ct. 3214 (1987); <u>Hoover</u> v. <u>Leonardo</u>, No. 91-CV-1211, 1996 WL 1088204 at *2 (E.D.N.Y. June 11, 1996).

[17]  <u>See also</u>, <u>e.g.</u>, <u>Banks</u> v. <u>Dretke</u>, 540 U.S. 668, 691, 124 S. Ct. 1256, 1272 (2004); <u>Moore</u> v. <u>Illinois</u>, 408 U.S. 786, 794-95 , 92 S. Ct. 2562, 2568 (1972); <u>United States</u> v. <u>Rivas</u>, 377 F.3d 195, 199 (2d Cir. 2004); <u>United States</u> v. <u>Jackson</u>, 345 F.3d at 71; <u>United States</u> v. <u>Gil</u>, 297 F.3d at 101; <u>United States</u> v. <u>Coppa</u>, 267 F.3d at 140; <u>United States</u> v. <u>Payne</u>, 63 F.3d 1200, 1208 (2d Cir. 1995), <u>cert. denied</u>, 516 U.S. 1165, 116 S. Ct. 1056 (1996); <u>Orena</u> v. <u>United</u>
(continued...)

**B.    Application of Brady v. Maryland to Frieson's Habeas Claim**

As to the first Brady component, Frieson has failed to establish that the cab driver's testimony would have been favorable to him.  Without an affidavit from the cab driver, Frieson's only basis to claim that the driver's testimony would have impeached Det. Schroeder is Frieson's own hearing testimony that he was not leaning through the partition or arguing with the driver.  (See page 4 above.)  Justice Tallmer, however, rejected Frieson's testimony and found that Frieson "'was perched forward on the passenger seat with his head through the partition'" and "'was moving his head back and forth and appeared to be having an argument with the driver.'"  (See page 5 above.)

As to the second Brady component, the prosecutor did not "willfully or inadvertently" suppress the evidence of the cab driver's name.  During cross-examination at the suppression hearing, Det. Schroeder stated that he believed the cab driver was named "Habib," but noted that he would have to check the complaint report to be certain.  (See page 3 above.)   Frieson's counsel Flack, however, chose not to ask Det. Schroeder to verify the driver's name.  (See page 4 above.)  Additionally, trial counsel Flack admitted in his affirmation that he "could have obtained the name from the People if [he] wanted it."  (Dkt. No. 18: Killian Aff. Ex. 12: Flack Aff ¶ 8.)  Because trial counsel Flack either had the cab driver's name or had the opportunity to ascertain it, the prosecutor did not violate Brady.  See, e.g., Batchilly v. Nance, 08 Civ. 7150, 2010 WL 1253921 at *35 (S.D.N.Y. Apr. 2, 2010) (Peck, M.J.) (no Brady violation where defense counsel knew of the existence of the evidence, but chose not to pursue it), report & rec. adopted, 2011 WL 1226260 (S.D.N.Y. Mar. 30, 2011); Sturdivant v. Barkley, No. 04-CV-5659, 2007 WL 2126093 at *6

---

<u>17/</u>      (...continued)
States, 956 F. Supp. at 1090.

(E.D.N.Y. July 24, 2007) ("Brady may not be invoked when defense counsel knew of the existence of the evidence, which was equally available to defense counsel, but chose not to pursue the matter.").[18/]

As to the third Brady prong, even if the cab driver provided favorable testimony to Frieson at the suppression hearing, it would not have changed the outcome of Frieson's trial. At best, the cab driver's testimony would have negated Det. Schroeder's basis for the stop, leading to suppression of the imitation pistol. Frieson's trial related only to the September 23, 2002 cab robbery; the September 30, 2002 imitation pistol and September 25, 2002 robbery charges were severed prior to trial. (See page 6 n.1 above.) Moreover, Justice Gross did not allow the prosecutor at trial to introduce evidence that Frieson was arrested with an imitation pistol on September 30, 2002. (Dkt. No. 14: Tr. 117-20.)[19/] Thus, even if the imitation pistol had been suppressed because

---

[18/]    See also, e.g., United States v. Zagari, 111 F.3d 307, 320 (2d Cir.) ("Brady cannot be violated if the defendants had actual knowledge of the relevant information . . . ."), cert. denied, 522 U.S. 983, 118 S. Ct. 445 (1997); United States v. Zackson, 6 F.3d 911, 918 (2d Cir.1993); United States v. LeRoy, 687 F.2d 610, 618 (2d Cir.1982), cert. denied, 459 U.S. 1174, 103 S. Ct. 823 (1983); Smith v. Edwards, 98 Civ. 7962, 2000 WL 709005 at *6 (S.D.N.Y. May 31, 2000) ("[T]he absence of a Brady violation is particularly clear where, as here, the evidence was equally available to the defense, which chose not to pursue this course of investigation. The rationale underlying Brady is that the defendant should not be denied access to exculpatory evidence only known to the government." (citations omitted)); Johnson v. People, No. 02 CV 3752, 2003 WL 23198785 at *15 (E.D.N.Y. Nov. 5, 2003) ("A Brady claim would not be available in this case because Brady cannot be invoked when defense counsel knew of the existence of the evidence, but chose not to pursue the matter.").

[19/]    Prior to trial, the prosecutor argued that the People should be able to elicit testimony that Frieson was arrested with an imitation pistol on September 30, 2002 because it would "complete[] the narrative" and explain to the jury how Frieson became a suspect in the September 23, 2002 robbery. (Tr. 5, 8-11, 55-56, 58-59.) In support of this argument, the prosecutor noted that the victim of the September 23, 2002 robbery would be able to testify that he has seen the imitation pistol and that it "looks like the weapon" used by Frieson
(continued...)

of the cab driver's testimony, it would not have affected Frieson's <u>trial</u>.

   Additionally, even if the cab driver's testimony would have led to suppression of the lineup identification, <u>see</u>, <u>e.g.</u>, <u>United States</u> v. <u>Crews</u>, 445 U.S. 463, 472, 100 S. Ct. 1244, 1250 (1980) (lineup identifications may be "suppressible fruits of [a] Fourth Amendment violation"), it would not have affected Frieson's trial.  Justice Tallmer conducted an independent source hearing and determined that the victim of the September 23, 2002 cab robbery had a sufficient basis, aside from the lineup, to make an in-court identification.  (<u>See</u> page 5 above.)  Consequently, even if the lineup had been suppressed, the victim still would have been permitted to identify Frieson at trial. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Wade</u>, 388 U.S. 218, 239-40, 87 S. Ct. 1926, 1939 (1967) (where line up identifications were suppressed because they were obtained through violation of defendant's right to counsel, the witnesses may still make in-court identifications if the prosecution establishes "by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification."); <u>Dell</u> v. <u>Ercole</u>, No. 06-CV-1724, 2009 WL 605188 at *4 (E.D.N.Y. Mar. 6, 2009) (for habeas purposes, hearing court findings presumed to be correct where the "hearing court 'properly declined to suppress the in-court identification of [petitioner] by two of the victims' because 'the testimony at an independent source hearing established that the victims had multiple opportunities to observe the defendant at close range for a lengthy period of time during the commission of the crime.'"); <u>Dow</u> v. <u>Walsh</u>, No. 03-CV-424, 2006 WL 484783 at

---

<sup>19/</sup> (...continued)
 during the robbery.  (Tr. 4, 21-22, 28-29, 35, 38, 51-52, 66-68, 108, 114.)  Justice Gross denied the prosecutor's application, finding that the fact that Frieson was arrested with an imitation pistol on September 30, 2002 was "prejudicial" and not "inextricably interwoven or essential to complete the narrative of an armed robbery which occurred on September 23rd."  (Tr. 117-20.)

*7 (E.D.N.Y. Feb. 28, 2006) ("Even if pretrial procedures have been unduly suggestive, a court may admit in-court identification testimony if the court determines it to be independently reliable."); People v. Thomas, 68 A.D.3d 685, 686, 893 N.Y.S.2d 7, 9 (1st Dep't 2009) ("Defendant's challenge to the victim's in-court identification of defendant is also unavailing.  At an independent source hearing, the People proved by clear and convincing evidence that the identification was based upon a source that was independent of a showup identification, which the court suppressed on Fourth Amendment grounds.").

Accordingly, Frieson's claims of prosecutorial misconduct should be DENIED.

## III.   FRIESON'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS SHOULD BE DENIED

### A.   The Strickland v. Washington Standard on Ineffective Assistance of Counsel

In Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), the Supreme Court announced a two-part test to determine if counsel's assistance was ineffective:  "First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id. at 687, 104 S. Ct. at 2064.[20]  This performance is to be judged by an objective standard of reasonableness.  Strickland v. Washington, 466 U.S. at 688, 104 S. Ct. at 2064.[21]  The "'purpose of the effective assistance guarantee of the Sixth Amendment is . . . simply

---

[20]   Accord, e.g., Harrington v. Richter, 131 S. Ct. 770, 787 (2011); Premo v. Moore, 131 S. Ct. 733, 739 (2011); Wiggins v. Smith, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003); Bell v. Miller, 500 F.3d 149, 156-57 (2d Cir. 2007); Henry v. Poole, 409 F.3d 48, 62-63 (2d Cir. 2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622 (2006).

[21]   Accord, e.g., Harrington v. Richter, 131 S. Ct. at 787; Wiggins v. Smith, 539 U.S. at 521, (continued...)

to ensure that criminal defendants receive a fair trial.'  Thus, '[t]he benchmark for judging any claim

of ineffectiveness must be whether counsel's conduct <u>so undermined</u> the proper functioning of the

adversarial process that the trial cannot be relied on as having produced a just result.'"  <u>Cullen</u> v.

<u>Pinholster</u>, 131 S. Ct. 1388, 1403 (2011) (quoting <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 686, 689,

104 S. Ct. at 2063, 2065) (citation omitted).

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction . . . .  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. . . .  [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

<u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 689, 104 S. Ct. at 2065 (citation omitted).[22/]  Ineffective

assistance claims "are quite often the law's equivalent of 'buyer's remorse' or 'Monday morning

quarterbacking' . . . .  Decisions by criminal defense counsel are often choices among bad

alternatives . . . ."  <u>Mui</u> v. <u>United States</u>, 614 F.3d 50, 57 (2d Cir. 2010); <u>accord</u>, <u>e.g.</u>, <u>Cullen</u> v.

<u>Pinholster</u>, 2011 WL 1225705 at *12; <u>Harrington</u> v. <u>Richter</u>, 131 S. Ct. at 788 ("It is 'all too

tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'").  Petitioner's

---

[21/]     (...continued)
123 S. Ct. at 2535; <u>Bell</u> v. <u>Cone</u>, 535 U.S. 685, 695, 122 S. Ct. 1843, 1850 (2002); <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 63.

[22/]     <u>Accord</u>, <u>e.g.</u>, <u>Cullen</u> v. <u>Pinholster</u>, 131 S. Ct. at 1403; <u>Harrington</u> v. <u>Richter</u>, 131 S. Ct. at 787-88; <u>Bell</u> v. <u>Cone</u>, 535 U.S. at 698, 122 S. Ct. at 1852; <u>Bierenbaum</u> v. <u>Graham</u>, 607 F.3d 36, 50-51 (2d Cir. 2010), <u>cert. denied</u>, 131 S. Ct. 1693 (2011); <u>Bell</u> v. <u>Miller</u>, 500 F.3d at 156-57; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 63; <u>Aparicio</u> v. <u>Artuz</u>, 269 F.3d 78, 95 (2d Cir. 2001); <u>Sellan</u> v. <u>Kuhlmann</u>, 261 F.3d 303, 315 (2d Cir. 2001).

"burden is to show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed to the defendant by the Sixth Amendment." Harrington v. Richter, 131 S. Ct. at 787 (quotations omitted).

Second, the defendant must show prejudice from counsel's performance. Strickland v. Washington, 466 U.S. at 687, 104 S. Ct. at 2064; accord, e.g., Cullen v. Pinholster, 2011 WL 1225705 at *12. The "question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." Id. at 695, 104 S. Ct. at 2068-69. Put another way, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068.[23]

_____

[23] See also, e.g., Cullen v. Pinholster, 131 S. Ct. at 1403; Harrington v. Richter, 131 S. Ct. at 787; Wiggins v. Smith, 539 U.S. at 534, 123 S. Ct. at 2542; Bell v. Cone, 535 U.S. at 695, 122 S. Ct. at 1850; Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006), cert. denied, 552 U.S. 836, 128 S. Ct. 75 (2007); Henry v. Poole, 409 F.3d at 63-64; Aparicio v. Artuz, 269 F.3d at 95; Sellan v. Kuhlman, 261 F.3d at 315; DeLuca v. Lord, 77 F.3d 578, 584 (2d Cir.), cert. denied, 519 U.S. 824, 117 S. Ct. 83 (1996).

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068; accord, e.g., Cullen v. Pinholster, 131 S. Ct. at 1403; Harrington v. Richter, 131 S. Ct. at 787; Wiggins v. Smith, 539 U.S. at 534, 123 S. Ct. at 2542; Bierenbaum v. Graham, 607 F.3d at 51. The phrase "reasonable probability," despite its language, should not be confused with "'more likely than not.'" Strickler v. Greene, 527 U.S. 263, 289-91, 119 S. Ct. 1936, 1952-53 (1999); accord, e.g., Harrington v. Richter, 131 S. Ct. at 792; Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1565-66 (1995); Nix v. Whiteside, 475 U.S. 157, 175, 106 S. Ct. 988, 998 (1986) ("[A] defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under Strickland."); Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."). Rather, the phrase "reasonable probability" seems to describe a fairly low
(continued...)

The Supreme Court has counseled that these principles "do not establish mechanical rules." <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 696, 104 S. Ct. at  2069.  The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process.  <u>Id.</u>

Any counsel errors must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or jury.'" <u>Lindstadt</u> v. <u>Keane</u>, 239 F.3d 191, 199 (2d Cir. 2001) (quoting <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 695-96, 104 S. Ct. at 2069); <u>accord</u>, <u>e.g.</u>, <u>Rodriguez</u> v. <u>Hoke</u>, 928 F.2d 534, 538 (2d Cir. 1991).  "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." <u>Harrington</u> v. <u>Richter</u> 131 S. Ct. at 788; <u>see also</u>, <u>e.g.</u>, <u>Cullen</u> v. <u>Pinholster</u>, 131 S. Ct. at 1403 ("The [Supreme] Court acknowledged that '[t]here are countless ways to provide effective assistance in any given case,' and that '[e]ven the best criminal defense attorneys would not defend a particular client in the same way.'").

The Supreme Court also made clear that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 697, 104 S. Ct. at 2069.[24]

---

[23]    (...continued)
standard of probability, albeit somewhat more likely than a "reasonable possibility." <u>Strickler</u> v. <u>Greene</u>, 527 U.S. at 291, 119 S. Ct. at 1953; <u>cf. id.</u> at 297-301, 119 S. Ct. at 1955-58 (Souter, J., concurring & dissenting) (arguing that any difference between "reasonable probability" and "reasonable possibility" is "slight").

[24]    <u>Accord</u>, <u>e.g.</u>, <u>Smith</u> v. <u>Robbins</u>, 528 U.S. 259, 286 n.14, 120 S. Ct. 746, 764 n.14 (2000).

In addition, the Supreme Court has counseled that:

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. . . . In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland v. Washington, 466 U.S. at 690-91, 104 S. Ct. at 2066.[25/]

"The Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." Lindstadt v. Keane, 239 F.3d at 199; accord, e.g., Cullen v. Pinholster, 131 S. Ct. at 1403 ("We take a 'highly deferential' look at counsel's performance."); Bierenbaum v. Graham, 607 F.3d at 50-51; Bell v. Miller, 500 F.3d at 156-57. "'Surmounting Strickland's high bar is never an easy task.'" Harrington v. Richter, 131

---

[25/]    See also, e.g., Harrington v. Richter, 131 S. Ct. at 789-90 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." Moreover, an "attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense."); Yarborough v. Gentry, 540 U.S. 1, 5-6, 124 S. Ct. 1, 4 (2003); Engle v. Isaac, 456 U.S. 107, 134, 102 S. Ct. 1558, 1575 (1982) ("We have long recognized . . . that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998) ("In reviewing Strickland claims, courts are instructed to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that counsel's conduct was not the result of error but derived instead from trial strategy. We are also instructed, when reviewing decisions by counsel, not to 'second-guess reasonable professional judgments and impose on . . . counsel a duty to raise every "colorable" claim' on appeal." (citations omitted)); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir.) (a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices"), cert. denied, 513 U.S. 820, 115 S. Ct. 81 (1994).

S. Ct. at 788 ("[T]he Strickland standard must be applied with scrupulous care" and "the standard for judging counsel's representation is a most deferential one.").

### 1. Strickland and the AEDPA Review Standard

For purposes of this Court's AEDPA analysis, "the Strickland standard . . . is the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Aparicio v. Artuz, 269 F.3d 78, 95 & n.8 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(d)(1)).[26/] "For AEDPA purposes, a petitioner is not required to further demonstrate that his particular theory of ineffective assistance of counsel is also 'clearly established.'" Aparicio v. Artuz, 269 F.3d at 95 n.8.

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Harrington v. Richter, 131 S. Ct. 770, 788 (2011) (citations omitted); accord, e.g., Cullen v. Pinholster, 131 S. Ct. at 1403 ("Our review . . . is thus 'doubly deferential.'"); Premo v. Moore, 131 S. Ct. at 740-41; Bell v. Cone, 535 U.S. at 698-99, 122 S. Ct. at 1852 ("For [petitioner] to succeed, however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a

---

[26/]    See also, e.g., Cullen v. Pinholster, 131 S. Ct. 1388, 1403 (2011); Premo v. Moore, 131 S. Ct. 733, 743 (2011); Wiggins v. Smith, 539 U.S. 510, 521-22, 123 S. Ct. 2527, 2535 (2003); Bell v. Cone, 535 U.S. 685, 698, 122 S. Ct. 1843, 1852 (2002); Mosby v. Senkowski, 470 F.3d 515, 518-19 (2d Cir. 2006), cert. denied, 552 U.S. 836, 128 S. Ct. 75 (2007); Sellan v. Kuhlman, 261 F.3d 303, 315 (2d Cir. 2001).

federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u> incorrectly.  Rather, he must show that the [state appellate court] applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner." (citation omitted)); <u>see also</u>, <u>e.g.</u>, <u>Yarborough</u> v. <u>Gentry</u>, 540 U.S. 1, 5, 124 S. Ct. 1, 4 (2003); <u>Mosby</u> v. <u>Senkowski</u>, 470 F.3d at 519.

####    B.    Application of the Strickland Standard to Frieson's Claims

####        1.    Trial Counsel Was Not Ineffective For Failing to Obtain the Identity of the September 30, 2002 Cab Driver or to Investigate Calling Him as a Witness

Frieson claims that trial counsel Flack was ineffective for failing to obtain the name of the cab driver who was present when Frieson was arrested and failing to investigate and call the driver as a witness.  (Dkt. No. 1: Frieson Pet. Att. at 2, 4-5, 8-9; Dkt. No. 19: Frieson Traverse at 11-15, 23-25.)  Frieson asserts that the cab driver's testimony would have contradicted Det. Schroeder's testimony that Frieson was leaning through the partition and arguing with the driver.  (Frieson Pet. Att. at 4-5, Frieson Traverse at 23-24; <u>see also</u> page 4 above.)  Specifically, Frieson asserts that trial counsel Flack's stated reasons for not calling the cab driver were false because:  (1) Flack could not have been concerned that the cab driver would have testified that the imitation pistol was not his because Flack had argued at the suppression hearing and trial that the imitation pistol did not belong to Frieson and could have belonged to the driver (Frieson Pet. Att. at 13-14; Frieson Traverse at 7-8); (2) Flack could not have been concerned about the cab driver's possible testimony about his route into the Bronx because "it had already been established . . . that none of the eleven yellow cab drivers ever stated in their complaints[] the routes[] or roads used to enter the Bronx[] from Manhattan" (Frieson Pet. Att. at 14; Frieson Traverse at 8); and (3) Flack could not have been

concerned that the cab driver would have testified that he was in fact Asian because the cab driver's race had already been disclosed during Det. Schroeder's testimony (Frieson Pet. Att. at 15; Frieson Traverse at 8-9).[27]

Justice Gross rejected these claims in denying Frieson's C.P.L. § 440 motion, ruling that trial counsel Flack's "actions did not constitute ineffective representation but, rather, reflected a well-reasoned, strategic decision." (Dkt. No. 18: Killian Aff. Ex. 15: Justice Gross 4/2/09 Decision at 11.) Relying on trial counsel Flack's affirmation (see page 11 above), Justice Gross found that Flack made "a tactical decision not to question [Det. Schroeder] about the driver's name or present him as a witness [at the suppression hearing] to avoid strengthening the People's case." (Justice Gross 4/2/09 Decision at 12; see page 11 above.) Justice Gross credited Flack's rationale that the cab driver's testimony was potentially harmful to Frieson because: (1) if the driver testified that he was afraid of Frieson (as indicated in Det. Schroeder's paperwork) it would have supported Det. Schroeder's testimony that Frieson had been arguing with the driver; (2) the cab driver might have testified that the pistol was not his and was not in the cab before he picked up Frieson; (3) the driver might have described the route he took into the Bronx as the same route as in the other cab robberies; and (4) if the driver testified that he was Asian it would provide additional similarities to the pattern robberies. (See page 11 above.)

---

[27]    As part of his federal habeas petition and traverse, Frieson includes an argument section claiming that trial counsel Flack committed perjury during the C.P.L. § 440 proceedings by filing a false affirmation concerning his reasons for not calling the yellow cab driver as a witness. (Frieson Pet. Att. at 13-15; Frieson Traverse at 6-10.) Liberally construing Frieson's "pro se submissions [] 'to raise the strongest arguments that they suggest,'" Diaz v. United States, 517 F.3d 608, 613 (2d Cir. 2008), this Court interprets Frieson's perjury claim as arguing that Justice Gross should not have credited trial counsel Flack's rationales because they were false.

In addressing an ineffective assistance claim, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland v. Washington, 466 U.S. 668, 689, 104 S. Ct. 2052, 2065 (1984); see also cases cited on page 33 above.  Moreover, the AEDPA provides that factual determinations by a state court are presumed to be correct unless rebutted by clear and convincing evidence.  (See cases cited at page 37 above.)

This Court cannot say that Justice Gross' decision that trial counsel Flack was not ineffective for failing to call a witness with potentially harmful testimony was an unreasonable application of the Strickland standard.  See, e.g., Palmer v. Marshall, 07 Civ. 5917, 2009 WL 47424 at *5 (S.D.N.Y. Jan. 8, 2009) (Castel, D.J.) (Trial counsel was not ineffective for failing to call petitioner's wife at trial because she "was also the victim's mother, and defense counsel may have concluded that the potential helpfulness of her testimony would be outweighed by the likelihood that she would exhibit antipathy toward petitioner and thereby harm his defense."); Mathieu v. Giambruno, 05 Civ. 8098, 2008 WL 383509 at *19 (S.D.N.Y. Feb. 11, 2008) (Trial counsel was not ineffective for failing to call a witness at trial where, inter alia, counsel believed that the witness' testimony "could do more harm than good" and "could open the door to the introduction of an incriminating statement made by petitioner that had otherwise been excluded."); Lopez v. United States, 95 Civ. 6312, 89 Cr. 478, 1996 WL 591210 at *3 (S.D.N.Y. Oct. 15, 1996) ("There was good reason to believe, as petitioner's counsel did, that [a potential witness] would not have corroborated defendant's testimony and, therefore, would harm defendant in his defense that the informant

entrapped the defendant.  Petitioner also has made no showing that [another potential witness] would have been anything but a very hostile and prejudiced witness.  Trial counsel's decision not to call the two witnesses at trial falls within the realm of trial strategy." (record citations omitted)), aff'd, No. 96-2964, 152 F.3d 919 (table), 1998 WL 406323 (2d Cir. June 8, 1998), cert. denied, 525 U.S. 974, 119 S. Ct. 429 (1998).

Finally, even if Frieson could establish that trial counsel Flack acted unreasonably, Frieson's claims still fail because he was not prejudiced by Flack's actions.  At best, the cab driver's testimony would have led Justice Tallmer to suppress the imitation pistol and lineup identification. (See pages 30-32 above.)  At trial, however, the prosecutor was precluded from presenting any evidence that Frieson possessed the pistol when he was arrested on September 30, 2002.  (See page 30 & n.19 above.)  Additionally, based on the independent source hearing, the victim of the September 23, 2002 cab robbery would have been allowed to identify Frieson in court even if the lineup was suppressed.  (See pages 5, 31-32 above.)   Thus, trial counsel Flack's actions at the suppression hearing had no effect on the outcome of Frieson's trial.

Accordingly, Frieson's claims that trial counsel Flack was ineffective for failing to obtain the identity of the cab driver and investigate calling him as a witness should be DENIED.

### 2.     Trial Counsel Was Not Ineffective For Failing to Call Frieson's Mother as an Alibi Witness

Frieson also claims that trial counsel Flack was ineffective for not calling Frieson's mother Augusta Frieson Clarke as an alibi witness.  (Dkt. No. 1: Frieson Pet. Att. at 8, 9-12; Dkt. No. 19: Frieson Traverse at 11, 15-23, 25, 26-27.)  Frieson claims that his mother had notified trial

counsel Flack that she knew Frieson was with her at the time of the robberies.  (Frieson Pet. Att. at 9-12, Frieson Traverse at 15-16, 17-18.)

Justice Gross rejected this claim, finding that Clarke "did not recall the events of September 23, 2002, and did not have any specific recollection as to whether [Frieson] was actually at home with her at the time of the robbery."  People v. Frieson, No. 5264/02, 27 Misc.3d 1208(A) (table), 2010 WL 1459470 at *4, *9 (Sup. Ct. Bronx Co. Apr. 13, 2010); see page 14 above.  While Clarke testified that she had told trial counsel Flack that Frieson "was always at home with her every evening," Justice Gross credited Flack's testimony that Clarke had told him that "she did not know when [Frieson] had entered or left her apartment that evening, and that he did not always sleep at home." People v. Frieson, 2010 WL 1459470 at *4, *9; see page 14 above.

In rejecting Clarke's "version of events," Justice Gross found Clarke's testimony incredible that the forty-year-old Frieson was home at 11:00 p.m. every night because her "'rules and regulations'" prohibited him from going out.  People v. Frieson, 2010 WL 1459470 at *4; see page 14 above.  Additionally, Justice Gross found that it was "most unlikely" that Frieson did not have keys to the front door and could not come and go as he pleased.  People v. Frieson, 2010 WL 1459470 at *4; see page 14 above.  Moreover, Justice Gross found that Clarke's affidavit that Frieson was at home at the time of the September 2002 robberies because of his leg injury conflicted with her hearing testimony that the injury was healing by September and that Frieson was always home at night because of her "rules and regulations." People v. Frieson, 2010 WL 1459470 at *5, *9; see pages 14-15 above.

Justice Gross found that he had "no reason to doubt the veracity of" trial counsel Flack and credited Flack's testimony (see page 13 above) that, during a second conversation, "Clarke recanted her earlier statements[] and admitted that she was asleep at the time of the robbery." People v. Frieson, 2010 WL 1459470 at *5, *9; see page 15 above.  Justice Gross noted "it is certainly believable that Clarke would have been asleep between 2:00 a.m. and 2:30 a.m., and thus, unaware of whether defendant was actually at home at that time."  People v. Frieson, 2010 WL 1459470 at *5, *9; see page 15 above.  Justice Gross found that trial counsel Flack had "fully explored" the alibi defense and that his decision to forego the defense was "a thoughtful, tactical decision." People v. Frieson, 2010 WL 1459470 at *5, *9; see page 15 above.

Frieson argues that, by "wrongly credit[ing] trial counsel's vague, evasive, and incomplete testimony," Justice Gross' decision "was based on an unreasonable determination of the facts." (Frieson Traverse at 23.)  Specifically, Frieson claims that Justice Gross should not have believed trial counsel Flack's testimony because Flack could not recall the exact point when he determined that he would not call Clarke as an alibi witness.  (Frieson Pet. Att. at 16-18; Frieson Traverse at 18-20, 22.) Moreover, although trial counsel Flack claimed at one point that he decided not to call her as a witness after their second conversation, Frieson asserted that Flack "could not even recall what the whole conversation entailed."  (Frieson Traverse at 19.)  Frieson therefore argues that Justice Gross "incorrectly credited trial counsel's testimony[] and disregarded[] the candid and credible testimony Mrs. Clarke would have presented to a jury." (Frieson Traverse at 22.)

Frieson's claims are meritless.  Frieson has presented no evidence, much less clear and convincing evidence, that Justice Gross' factual determinations were unreasonable.  At base, Frieson's argument is that Justice Gross erred in crediting trial counsel Flack's version of events over Clarke's.  All the credibility concerns Frieson brings to this Court's attention about trial counsel Flack's testimony were before Justice Gross, who, after observing both Clarke and trial counsel Flack testify, decided to credit Flack's account.

Moreover, Justice Gross' credibility determinations were reasonable as Clarke's testimony was incredible.  Notably, despite the fact the Frieson was forty years old at the time of the robberies, Clarke maintained that he was locked at home every night because of her "rules and regulations" and was not allowed to go out at night without permission.  (See page 12 above.)  This Court agrees with Justice Gross that such testimony was "difficult to believe" and that it was "most unlikely" that Frieson did not have keys to the front door and could not come and go as he pleased. People v. Frieson, 2010 WL 1459470 at *4;  see page 14 above.[28]

As Frieson has failed to present clear and convincing evidence that Justice Gross' factual determinations were unreasonable, this Court is not permitted to re-evaluate the credibility of witnesses not before it, and has no basis to disturb the state court's credibility determinations. See, e.g., Cotto v. Herbert, 331 F.3d 217, 233 (2d Cir. 2003) ("As the [New York] Court of Appeals noted in upholding the trial court's determination, the 'credibility clash' presented at the hearing 'has

---

[28]    Furthermore, as Justice Gross found, Clarke's testimony that Frieson was always home at nights because of her "rules and regulations" not only was incredible, but also was inconsistent with her affidavit stating that Frieson was home at the time of the September 2002 robberies "because 'he had injured his legs in an accident and was on crutches the entire time.'"  People v. Frieson, 2010 WL 1459470 at *5, *9;  see pages 14-15 above.

been resolved by findings of the Trial Judge (who observed the witnesses)-affirmed by the Appellate Division-that the People's evidence was credible, the contrary evidence not.' On habeas review, the petitioner has the burden of 'rebutting the presumption of correctness by clear and convincing evidence.' Given the extremely narrow scope of our review, we cannot reverse the trial court's finding that [petitioner] was behind the intimidation of [a witness] as an 'unreasonable determination of the facts in light of the evidence presented.'" (citations omitted)); McKinney v. Burge, No. 04-CV-1150, 2009 WL 666396 at *17 (N.D.N.Y. Mar. 10, 2009) ("State courts frequently must resolve conflicts in the testimony of law enforcement officials and defendants when determining whether a statement was voluntary. In these circumstances, 'the law is clear that state-court findings on such matters are conclusive on the habeas court if fairly supported in the record.'" (quoting Tibbs v. Greiner, 01 Civ. 4319, 2003 WL 1878075 at *9 (S.D.N.Y. Apr. 16 2003) (Peck, M.J.)).[29]

---

[29]    See also, e.g., Sanna v. DiPaolo, 265 F.3d 1, 10 (1st Cir. 2001) (Where suppression hearing judge credited officers' testimony about the interrogation over petitioner's conflicting testimony, and the state appellate court "resoundingly endorsed its credibility assessment" on appeal, habeas court rejected Miranda claim where petitioner "simply insist[ed] that the officers' testimony was untrustworthy" and offered no clear and convincing evidence to rebut the factual finding. "Credibility is quintessentially a matter of fact, reserved in almost every circumstance for the trier. . . . [I]t would be wholly inappropriate for a federal court to repastinate soil already thoroughly plowed and delve into the veracity of the witnesses on habeas review."); McClelland v. Kirkpatrick, No. 08-CV-683, 2010 WL 743879 at *2 (W.D.N.Y. Feb. 25, 2010) ("[I]n federal habeas review, questions of credibility of witnesses are left to the trier of fact, in this instance, the [state] court judge who conducted the suppression hearing and, as such, provides no basis for federal habeas relief even if further discrepancies could have been demonstrated."); Cordero v. Rivera, 677 F. Supp. 2d 684, 690 (S.D.N.Y. 2009) (Petitioner's "new claim-that [a witness'] recantation of his trial testimony establishes petitioner's innocence-was fully presented to a state court which rejected it after making the factual determination, based on an evidentiary hearing at which [the witness] testified and was subject to cross examination, that [the witness] was 'utterly incredible and unworthy of belief.' That adjudication on the merits and premised on the state court's firm and unequivocal factual determination is thus entitled to a presumption of correctness."

(continued...)

Additionally, even if Clarke's alibi evidence actually was true, given its incredible nature, trial counsel Flack's decision not to present the alibi defense was neither unreasonable nor prejudicial to Frieson, and Justice Gross' decision was not contrary to or an unreasonable application of Supreme Court precedent.  See, e.g., Bennett v. Fischer, 246 F. App'x 761, 765 (2d Cir. 2007) (trial counsel not ineffective for failing to present an alibi witness where the witness "'could not be believed on the critical issue of the date and time she had a chance encounter with petitioner on the early morning of the murder.'"), cert. denied, 552 U.S. 1288, 128 S. Ct. 1722 (2008); Matthews v. Mazzuca, 120 F. App'x 856, 858 (2d Cir. 2005) (denying ineffective assistance claim since there was no "reasonable probability" that the alibi defense "would have yielded a different verdict" because the alibi did not account for the estimated time of the burglary); Ryan v. Rivera, 21 F. App'x 33, 35 (2d Cir. 2001) (trial counsel not ineffective for failing to investigate and interview potential alibi witnesses where, after reviewing the witnesses' statements and the discovery paperwork, counsel

---

29/   (...continued)
(citation omitted)); Scott v. Fisher, 652 F. Supp. 2d 380, 429-30 (W.D.N.Y. 2009) ("The conflicting aspects of the suppression hearing testimony that [petitioner] has brought to this Court's attention were all presented to the suppression court at the hearing. The record adequately supports the conclusion that, contrary to [petitioner's] contentions, the police officers read him the entire set of Miranda warnings.  Absent clear and convincing evidence, this Court is not permitted to re-evaluate the credibility of witnesses not before it, and has no basis here to disturb the state court's credibility determinations on that issue."); Tirado v. Walsh, 168 F. Supp. 2d 162, 170 (S.D.N.Y. 2001) ("It is not within the purview of a federal court on habeas review to reassess and pass judgment upon the credibility of a witness whose testimony and demeanor it has not observed."  Thus, where petitioner took "issue with the trial court's assessment of [the detective's] credibility and its decision to . . . credit [the detective's] testimony at the suppression hearing. . . . , [the habeas] Court decline[d] to entertain [petitioner's] credibility claim."); La Torres v. Walker,  216 F. Supp. 2d 157, 167 (S.D.N.Y. 2000) ("It is well settled that on habeas corpus review deference is to be given to factual findings made by state courts. . . . This is particularly the case when a witness's credibility is in question.  '[AEDPA] gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'").

determined "that the alibi witnesses were not credible or that their testimony would harm [petitioner] more than it would help him."); Jackson v. Lee, 10 Civ. 3062, 2010 WL 4628013 at *40-41 (S.D.N.Y. Nov. 16, 2010) (Peck, M.J.) (defense counsel's decision to not present a "'dubious alibi'" was not unreasonable or prejudicial where the "alibi failed to establish that [petitioner] was not at the scene of the crime"), report & rec. adopted, 2010 WL 5094415 (S.D.N.Y. Dec. 10, 2010); Curry v. Burge, 03 Civ. 0901, 2007 WL 3097165 at *13 (S.D.N.Y. Oct. 23, 2007) (Peck, M.J.) ("This Court finds that it was a reasonable strategic decision for [defense counsel] not to further investigate witnesses who were not being called by the prosecution, . . . and who in counsel's view would have undermined his trial strategy and been harmful to the defense case." (fn. omitted)), report & rec. adopted, 2007 WL 4098115 (S.D.N.Y. Nov. 16, 2007); United States v. Romero, 91 Cr. 586, 1993 WL 485677 at *8 (S.D.N.Y. Nov. 22, 1993) (defense attorney's decision not to interview alibi witnesses was reasonable since their testimony "could not conclusively establish that [the defendant] was not traveling back and forth between Detroit and New York during the period he was alleged to have participated in certain narcotics activities in New York."), aff'd, 54 F.3d 56 (2d Cir. 1995), cert. denied, 517 U.S. 1149, 116 S. Ct. 1449 (1996).

Moreover, as Justice Gross noted, People v. Frieson, 2010 WL 1459470 at *10; see page 15 above, given that the prosecution's case was based on one witness identification with no physical evidence, trial counsel Flack made a reasonable strategic decision to focus on the issue of reasonable doubt and not present Clarke's problematic alibi. See, e.g., Perkins v. Comm'r of Corr. Serv., 218 F. App'x 24, 26 (2d Cir. 2007) (Petitioner "challenges as ineffective assistance of counsel his attorney's determination not to call as alibi witnesses [petitioner's] aunt and father . . . . Trial

counsel's affidavit adequately explains his strategic reasons for not calling the alibi witnesses . . . . Counsel's decisions, seen in the context of his vigorous attack on the reliability of the identification of [petitioner] by the only eyewitness, fall within the wide range of professionally competent assistance." (quotation omitted)); Headley v. Ercole, No. 07-CV-979, 2010 WL 3808685 at *8 (N.D.N.Y. Sept. 22, 2010) (trial counsel not ineffective for foregoing a possible alibi defense and instead "pursu[ing] a strong alternative theory by focusing on the lack of physical evidence, the suspiciousness of Petitioner's 'confession,' and the unsavoriness of the prosecution's witnesses."); Bennett v. Fischer, No. 02 CV 5232,  2006 WL 1084772 at *17 (E.D.N.Y. Apr. 25, 2006) (Weinstein, D.J.) (by deciding to abandon an alibi defense after "one damaging alibi witness" testified, defense counsel "wisely avoided putting the defense in a position of weakness, and concentrated instead on aggressively attacking what he believed to be the prosecution's weak case"); People v. Charleston, 161 A.D.2d 544, 545, 556 N.Y.S.2d 48, 49 (1st Dep't) ("[T]he fact that [defense counsel] attempted to exploit weaknesses in the prosecution's eyewitnesses rather than to search for [an allegedly exculpatory] witness whose character might also be subject to possible disparagement is not an unreasonable tactical decision."), appeal denied, 76 N.Y.2d 854, 560 N.Y.S.2d 993 (1990).

As the Supreme Court has stressed, "[t]he standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Harrington v. Richter, 131 S. Ct. 770, 788 (2011) (citations omitted); see also cases cited on pages 37-38 above.  Because Frieson has not shown that trial counsel Flack's actions were unreasonable and prejudicial, much less that Justice Gross' decision was an unreasonable application of Strickland,

Frieson's claim that Flack was ineffective for failing to present Clarke as an alibi witness should be DENIED.[30/]

## CONCLUSION

For the reasons set forth above, Frieson's habeas petition should be DENIED in its entirety and a certificate of appealability should not be issued.

---

[30/]  Frieson's traverse raises the additional claim that trial counsel Flack was ineffective for failing to use Frieson's medical records as evidence that "he was injured and recovering slowly" when the robberies were committed.  (Frieson Traverse at 17, 25-27.)  As an initial matter, since Frieson did not raise this argument in his leave letter to the First Department (see pages 16-17 above), this claim is unexhausted and procedurally barred.  See, e.g., Campbell v. Poole, 555 F. Supp. 2d 345, 369 (W.D.N.Y. 2008) ("[I]n his subsequent leave application to appeal the denial of second C.P.L. § 440.10  motion, [petitioner] blamed counsel for not calling his mother as a witness, but he did not seek review on the issue of the alleged prosecutorial threats.  Therefore, he failed to complete a full round of the appellate review process with regard to the claims involving alleged prosecutorial threats, and the claim is not fully exhausted.  However, the claims must be deemed exhausted because he cannot raise them in any state court forum.  That procedural default bars [habeas relief] here." (citations omitted)).

Furthermore, even if the claim were not procedurally barred, it is without merit.  Trial counsel Flack testified at the hearing that Frieson had recovered by the time of the robberies in late September 2002.  (See pages 13-14 above.)  Trial counsel Flack further testified that Frieson had "none of the symptoms of" a leg injury when he was arrested on September 30, 2002.  (See page 14 above.)  Moreover, trial counsel Flack's testimony was supported by Clarke's testimony that Frieson was healing and no longer using crutches in September 2002. (See page 12 above.)  As such, trial counsel Flack was not ineffective for failing to use medical records that did not support Frieson's case.  See, e.g., United States v. Noble, 363 F. App'x 771, 773 (2d Cir. 2010) ("An attorney's '[f]ailure to make a meritless argument does not amount to ineffective assistance.'"); Calderon v. Perez, 10 Civ. 2562, 2011 WL 293709 at *38 (S.D.N.Y. Jan. 28, 2011) (Peck, M.J.) ("[D]efense counsel cannot be ineffective for failing to put forth [a] meritless argument."), report & rec. adopted, 2011 WL 1405029 (S.D.N.Y. Apr. 5, 2011).

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.[31/]  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable P. Kevin Castel, 500 Pearl Street, Room 2260, and to my chambers, 500 Pearl Street, Room 1370.  Any requests for an extension of time for filing objections must be directed to Judge Castel (with a courtesy copy to my chambers).   Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988);

---

[31/]      If the pro se petitioner requires copies of any of the cases reported only in Westlaw, petitioner should request copies from opposing counsel.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.1(c)

McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

72.

Dated:       New York, New York
             July 12, 2011

                                         Respectfully submitted,


                                         _____
                                         Andrew J. Peck
                                         United States Magistrate Judge


Copies to:    Phillip Frieson
              Nancy D. Killian, Esq.
              Judge P. Kevin Castel